# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT D.M.

Renee M. Ortega
Crown Point, Indiana

ATTORNEY FOR APPELLANT E.A.

Deidre L. Monroe
Gary, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Marjorie Newell
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: D.S. and A.A., Minor Children,

and

D.M., Mother, and E.A., Father,

*Appellants-Respondents*,

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*.

May 30, 2017

Court of Appeals Case No. 45A03-1611-JT-2502

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Jr., Judge

Trial Court Cause Nos.
4506-11508-JT-200
4506-11508-JT-201

**Brown, Judge.**

D.M. ("Mother") and E.A. ("Father," and together with Mother, "Parents") appeal the involuntary termination of their parental rights. Parents raise several issues which we consolidate and restate as whether the evidence is sufficient to support the termination of their parental rights. We affirm.

## *Facts and Procedural History*

D.S. was born to Mother on November 17, 2011, and D.S.'s alleged biological father is A.S. A.A. was born to Mother on July 23, 2013, and A.A.'s father is Father.[1] The Children were removed on November 23, 2013.

On November 26, 2013, the Indiana Department of Child Services ("DCS") filed petitions alleging that D.S. and A.A. (together, the "Children") were children in need of services ("CHINS"). The petitions alleged in part that DCS had received a referral that the Children were not being fed properly, that one of the Children had what appeared to be sores on her head, and that the Children had been left with a woman ("Caregiver"); and that Caregiver indicated she had been providing care for the Children for approximately two years and the Children slept on a futon bed in the studio apartment where Caregiver resided with her two adult daughters. The petitioners also alleged that Caregiver did not have infant formula or food in the apartment and the milk which A.A. had been drinking smelled spoiled; DCS was able to establish contact with Mother who indicated she resided at various addresses in Illinois; Mother admitted that

---

[1] Father testified he signed the birth certificate or paternity affidavit.

she had not had stable housing since she was eighteen years of age and stated she met Caregiver at a local convenience store as she was friends with another babysitter in the same building; and Father is alleged to have signed the birth certificate for A.A. but does not provide the necessary emotional or financial support. The petitions stated that DCS took custody of the Children and placed them in foster care.

[4] That same day, the court held an initial hearing as to Mother and found that Mother admitted to the material allegations in the petitions and that the Children were CHINS. On December 23, 2013, the court entered an Order on CHINS Disposition Hearing as to D.S. and A.A. which adopted a permanency plan of reunification and ordered Parents to participate in the services specified in the adopted case plan. On March 31, 2014, the court issued an order finding that Father admitted to the material allegations in the CHINS petitions and reaffirmed all orders as to Father. On April 24, 2015, the court issued a Review Hearing Order which adopted a permanency plan for Children of termination of parental rights with adoption.

[5] In August 2015, DCS filed a petition for termination of Parents' parental rights alleging there is a reasonable probability the conditions that resulted in removal or placement outside the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of the Children, that termination is in the best interest of Children, and that there is a satisfactory plan for the care and treatment of the Children.

On October 12, 2016, the court held a fact-finding hearing. DCS presented a progress report covering the period of September 14 to 30, 2014, stating D.S. appears developmentally delayed and A.A. has to wear braces when she sleeps to help correct her legs, Mother's housing is still unstable, Mother is seeking employment to move and plans to move to another area, and Father participates in parenting courses and home based therapy but has not yet met with the Fatherhood engagement worker and "cancels or is a no call no show." DCS Exhibit L at 4. DCS also presented a progress report covering the period of January 26 to March 31, 2015, stating that D.S. was attending occupational and speech therapy and is making significant progress; A.A. receives physical and developmental therapy; the Children had not been returned to the care of Mother for the lack of stable housing, noncompliance with services, and repeated domestic violence relationships and occurrences; Mother had been provided with domestic violence therapy, home-based casework services, homemaker services, home-based therapy, and supervised visitation; and Mother had been inconsistent with participation in domestic violence therapy and homemaker services and had canceled some supervised visitations. The report also stated that Father had been provided with an initial clinical interview assessment, home-based therapy, and supervised visitation; Father was compliant with home-based therapy, received a noncompliance letter from Fatherhood Initiatives, and had canceled several supervised visitations in February 2015 and March 2015; and according to a visitation facilitator Father does not come prepared to visitations and has become dependent on the facility and foster mother to provide toys, food, and diapers for A.A.

[7]     Monique Kimp, the Children's foster mother, testified the Children had been in her care for almost three years and that when the Children were first placed with her D.S. was very withdrawn, did not talk, had sores on her head, A.A. was very underweight for her age, very stiff, and spastic, and both were missing patches of hair on their heads and were very dirty. She also testified that D.S. did not talk for six months; both Children received speech, developmental, and physical therapy; A.A. still needs behavioral services; D.S. is in a special needs class and has made a lot of progress under her care; and she was told A.A. would not be able to walk, A.A. was pigeon toed, and now she is walking. Kimp indicated D.S. was about two years old when Kimp received her and has been in her care more than half of her life and that A.A. was about four months old when Kimp received her and has been in her care basically her entire life. Kimp testified that she has told the Parents that she would always allow them to see the Children, including if their parental rights were terminated. She indicated extra effort is required to meet the Children's special needs, she works with mentally challenged individuals and knows what it takes to care for them including taking them to neurology and physical therapy appointments, the Children will continue to need the type of intensive special care she is providing, she believes the best thing for the Children is to remain in her care, and the Children have bonded with her. Kimp also stated that, if the court were to terminate the parental rights of Parents, she would pursue adoption of the Children.

[8] Audrey Gaines, a clinical therapist for Capital City, testified that she received a referral for Mother and had worked as her therapist for over a year, she started seeing Mother twice a week, and it was changed to once a week because family case manager Laura Middleton ("FCM Middleton") indicated Mother was not progressing. Gaines testified Mother was dealing with depression, she was dealing with severe headaches and was in and out of psych wards, "she'll get a job, then it will go, because she doing a headache, she couldn't make it to work," and "she'll progress then go back and forth, go down, loss a job, because of the headaches, going in and out of the hospital." Transcript at 31. Gaines testified that, when Mother "first started going to the hospital complaining about the headaches[,] [s]he said it was the marijuana that she had that was probably laced [w]hich the headache came from that and it just kind of been a rippling effect with that." *Id.* at 32. When asked about Mother's housing and employment, Gaines answered: "It's been an up and down. She'll get housing which she was doing really good. She had moved to Harvey. Nice place for her and the kids. Then she lost that place. . . . [S]he stayed with a friend and then after that she has a place now. It's a kitchenette that she has now in Hammond." *Id.* When asked if the kitchenette apartment was suitable to have two children with her, Gaines testified "No. I mean, I don't know if you know of a kitchenette. It's very small. She has a twin size bed. I mean, even to get bunkbeds for the kids, it would really be tight. . . . It's like a room . . . . So, she would need a bigger place." *Id.* at 33. Gaines indicated Mother was still looking for a bigger apartment. When asked if Mother was able to keep employment, Gaines testified "a consistent job? No," that Mother is working

again now and has a client for a "CNA kind of thing," that she just obtained a security job. *Id.* at 33.

[9] Todd Johnson, a social worker for Apostolic, received a referral for Father and worked with him for approximately two years. Johnson testified that Father's current employment would not be enough to care for a child, Father resided with his grandmother and mother at times, and he has attempted to save the resources to obtain housing but that never materialized. Johnson testified that he spoke with Father over the previous two months and Father's statement was that basically he is not in a position to have A.A. live with him and he would like for her to remain with the foster parent because she could care for A.A. properly. Johnson further indicated that two years is sufficient time to meet most of the goals, he believes there is some low cognitive functioning issues that interfere with Father's ability to meet the demands of DCS and the objectives set, and that initially Father was focused and tried his best but somewhere in the process he lost track and the goals were never achieved. Johnson indicated Father was consistent with his weekly appointments and was receptive to his suggestions but had a tendency to become frustrated because of a lack of progress and his effort would decline.

[10] Mother testified that, after her mother passed away, "it was pretty tough" and Caregiver said "since your mom just died, let me take the kids and watch them for you." *Id.* at 64. Mother indicated she received a lot of services, including home-based casework services to help her find stability, transportation, a clinical assessment, a psychological assessment, domestic violence therapy, and

visitation. She testified she was referred to domestic violence therapy two years earlier, she had not been consistent, and she just started going back. Mother indicated that she and Father were involved in an altercation one time about two years earlier, that she had been to a psychiatric hospital three or four times, and she smoked marijuana that was laced one time and her body felt on fire and an ambulance was called. Mother indicated she had been receiving services for three years, she had not finished her domestic violence therapy, she needs a larger apartment, she has her own car, and she has "moved from job to job quite a bit." *Id.* at 68. She stated that some of the times she missed her supervised visitation were because of her situation, sometimes she would oversleep and call them, and when asked how many visits she missed, she replied at least six that year.

[11]     When asked if she felt she was in a position to care for the Children on a day-to-day basis, Mother answered "[a]s of right now, no." *Id.* at 71. She testified she was living in a kitchenette in Hammond and had been there for five or six months, she is currently employed for a security firm, that she began that job in June, and when asked how many hours a week she works for the firm, answered "[t]wo weeks, forty" and indicated it was a full-time job. *Id.* at 73. She also indicated she works for Home Helpers taking care of one client twenty-five hours a week and she had that job for a year. Mother indicated she was upset when her therapy sessions were reduced to once a week and she wanted to see her therapist more. When asked about obtaining larger housing, Mother indicated she had been putting in applications, had been searching for better

jobs, and is currently in school online as well. She indicated she loves the Children, at this point she does not feel she is capable of attending to their everyday needs, and she needs to have her own place, a good paying job, and everything the Children need.

[12] Mother further stated she lives above a bar and which is really not appropriate for the Children. She indicted a man helped her moved there so that she could leave the shelter and that a person can stay at the shelter for only forty-five days. Mother indicated she knows D.S. is developmentally delayed but does not believe A.A. has special needs. When asked if she had time to care for the Children, Mother replied she does not have the time but will make the time. She indicated she has a 2015 vehicle, her monthly payment is $437, and she plans to give it back so that she could obtain a bigger apartment. She indicated she went to the shelter in 2016 because of domestic battery, that she was battered by a person who was not Father or A.S., and that she rents the kitchenette for $300. Mother said the Children have been out of her care for three years, that if reunited with the Children she would quit her home care job so that she would have time to care for them, she would not continue with school, follow doctors' instructions regarding the Children's special needs, and obtain a different car, and that she was asking the court to grant her some additional time to obtain a larger house. When asked who battered her, Mother answered Father and another man. Counsel for DCS stated "you've mentioned also that you want more time," "[t]hat you would make the changes [and] would get the resources that you need to take care of the kids," and "[y]ou've

been getting services for three years now," and asked "[a]nd you haven't achieved those goals in three years yet," and Mother answered "[r]ight." *Id.* at 94. When asked "[s]o, why is the Judge supposed to believe that you could do it in three or four months if you haven't done it in three years," Mother replied "I don't know." *Id.* at 95.

[13] Father testified he did not know A.A. has special needs but knew she was having behavioral issues. He testified A.A. has made a lot of progress under Kimp's care, her hair grew, and she is talking and walking more. He testified Caregiver started off watching the Children on just the weekends. When asked if he was in a position for A.A. to live with him, Father answered "[r]ight now, no. But I am working on it." *Id.* at 119. He indicated he had been provided services for three years, including home-based casework services and therapy that he has worked for Walmart, his total hours there would be forty, and he works mornings for another company two days a week. He stated he lived in Harvey for about a year, then moved to his grandmother's house, and recently moved to his sister's house. He asked if his home is appropriate for A.A., Father replied that "the only problem is she has section eight, so I can't bring the kids," he would have to be on the lease and he is not on the lease, and he would need to have his own apartment. *Id.* at 124. When asked "[y]ou are not anywhere close to having your own apartment right now, right," Father answered "[w]ell, technically, I can, by December." *Id.* When asked if it would be detrimental to A.A. to leave Kimp's home, Father replied affirmatively. Father indicated his services included parenting classes, therapy,

and Fatherhood Initiative. When asked if he completed a parenting class or course, Father answered: "No. It's a, I guess it's a hands – I don't know how she explained it, but it's hands-on parenting. Like, its visit and then it's hands-on parenting." *Id.* at 126.

[14] Father testified he was on the waiting list for Section 8 housing, that he loves A.A., he does not want to lose his bond with her, and that he believes he could have proper housing by the end of November. He also indicated he has had supervised visitations for three years, he earns $1,400 per month between his two jobs, has expenses of $370, and has saved $500. When asked "where's the other thousand dollars a month go to," Father replied that sometimes his grandmother "has shutoffs" and "if she can't afford to get it paid, then [he] help[s] her with that." *Id.* at 133. He indicated he had been working a full-time job and a second part-time job since April of 2015 and that, when he was staying with his grandmother, his money came in and went out and he really had nothing to save.

[15] FCM Middleton testified she is the case manager for the Children, that Mother's psychological assessment shows she needs a lot of services, and that DCS made referrals for those services. She testified that there were a lot of inconsistencies when she first received the case, that in February 2015 Mother was living with a person whom she had stated was her father, and that a home-based caseworker contacted her to let her know that Mother had been taken to a shelter, the person Mother stated was her father was not actually her father, and there had been a physical altercation because the man made advances to

have sex with Mother and she refused. FCM Middleton testified that Mother stayed at St. Jude Home for one week, Mother acquired a car in April 2015 and obtained an apartment in Harvey, her visitations were still sporadic, there was "[m]ild compliance" with domestic violence therapy, and that "[d]uring that time we thought we were on track to go ahead and move towards in home, but then she started to decline in visitations with her children." *Id.* at 139. She indicated Mother missed six consecutive weeks of visitation around September 2015, in November 2015 there was a court hearing and Mother disclosed she had been evicted from her apartment, in December 2015 Mother had a psychiatric stay and did not participate in visitation because she was in acute care, Mother was sporadic with visitation in January 2016, Mother had two visits per week, she made one visit and missed seven visits in July, and she was compliant in August 2016. When asked the reasons for the missed visits, FCM Middleton replied "[t]he reasons that I did read in the monthly reports were she would do a lot of no-call, no-shows." *Id.* at 141. She indicated Mother would say she overslept or was working. FCM Middleton testified that Mother's inconsistency with visitation made it very difficult and that was when DCS recommended the case plan be changed to TPR with adoption.

[16]     FCM Middleton testified that Mother had lived at a home in Calumet City, that "when she was first put in the St. Jude, she did eventually go back" to the Calumet City home, she asked Mother "why would she go back there knowing that there was a domestic violence incident," and that was when DCS wanted "to enhance her domestic violence therapy more so." *Id.* at 142-143. FCM

Middleton testified "[a]fter that she was in a shelter," "[t]hen in April 2015, she had the apartment in Harvey," she was evicted from that place in November 2015, after that she was living with friends, and that "she just moved into this kitchenette, I want to say May of this year." *Id.* at 143. FCM Middleton stated that in April 2016 there was a meeting at which Mother had a person with her whom she stated was a family friend or uncle and that Mother later called to say that she "may be getting put out because the gentleman that she was living with was not actually her uncle, it was her companion, and he felt that she was using him for his money." *Id.* at 144. FCM Middleton indicated Mother had not completed many domestic violence therapy sessions and she had not received a domestic violence report since April of 2016. When asked if Mother had been consistent with meeting with her home-based casework provider, FCM Middleton replied there was some noncompliance, she had switched Mother's home-based caseworker maybe two times at Mother's request because she was not getting along with the caseworkers, and that "sometimes they would say, we have to do a job search" and Mother "wouldn't want to participate." *Id.* at 145. When asked her assessment of Mother's progress, FCM Middleton responded that Mother's problems appear to be the same as when she received the case in 2015 and there was some progress but Mother would revert back to noncompliance and not having stable housing.

[17] When asked about Father, FCM Middleton testified that he became noncompliant with therapy the beginning of 2016 and missed visitations, he did have months where he was consistent, the visitation facilitator noticed he

needed some help in parenting and made a referral for hands-on parenting education, and the visitation facilitator stated that she needs to prompt Father continuously throughout visitations with A.A. She testified Father is "on and off sometimes" with his therapy and visitation and that he missed about thirty percent of his visits. *Id.* at 149. FCM Middleton testified Mother "would only do maybe half of out of the eight visits that she can actually have" during the month. *Id.* at 150. She indicated the reason Father gave for missing visitations was work, that she felt she provided the Parents with every service necessary so they could have made progress, there was nothing else she could have done as a case manager, and she felt like the domestic violence problem had not been addressed as there was an incident in 2016 involving the person with whom Mother was living.

[18] FCM Middleton further testified that D.S. was diagnosed with mild retardation and is two years delayed, A.A. was developmentally delayed and receives occupational therapy and that the Parents are not in a position to meet the daily special needs of the Children. She testified D.S.'s speech has improved and her hair is growing, A.A. is extremely attached to Kimp, and A.A.'s gait has improved. She indicated her recommendation was that the court terminate the parental rights of Parents and believes that termination is in the Children's best interests due to Mother's housing instability, the trend of Mother's domestic violence relationships, Father's admission he does not have a family support system, Father's finances and housing, and the fact the Parents have said they would not be able to take the Children to their appointments. FCM Middleton

indicated she had reason to doubt Father's testimony he could obtain housing by the end of November "[b]ecause this has been a pattern since 2015 of, I'm going to move, I'm going to get my own place, and it's in between jobs." *Id.* at 159. When asked how many times it was reported to her that visitation was cancelled for reasons outside of Mother's control, she responded maybe less than five times since she was assigned the case in January 2015.

[19] On October 18, 2016, the court issued an order terminating the parental rights of Parents. The court found:

> There is a reasonable probability that the conditions resulting in the removal of the [Children] from [the Parents'] home will not be remedied in that: The children were removed from parental care in November of 2013 and made wards of the Department of Child Services. Mother left the children with a friend, [Caregiver] for an extended period of time. [A.A.] was underweight and developmentally delayed. [D.S.] had sores on her head and was non-verbal. The hair on both children's heads was falling out. The children had spoiled milk in their bottles and both children were extremely dirty in their appearance. [A.A.] had problems walking and required braces for her legs which neither parent had addressed.
>
> Parents were offered services pursuant to a case plan which included substance abuse assessments, parenting assessment, parenting education, home based casework services, initial clinical assessments, individual therapy, psychological evaluations, domestic violence counseling and supervised visitations.
>
> Mother's therapist, Ms. Gaines testified that [M]other suffered from depression and had numerous cognitive deficits. Mother has been psychiatrically hospitalized on numerous occasions in

an effort to stabilize mother. Mother has a history of housing instability and continues to move from place to place. Mother, to this date, does not have a stable residence for the children. Mother has a lot of individual needs of her own to address. Mother cannot properly parent two special needs children due to mother's own special needs. Mother is currently in no position to parent these children.

Mother's psychological evaluation indicated that mother suffers from borderline intellectual functioning. Mother also has a history of poor decision making.

Mother testified that after three years of services, three years of continued help that she is still in no position to care for these children. Mother currently does not have appropriate housing or employment to care for the children. Mother testified that she cannot meet the daily needs of the children. Mother testified that she works approximately 65 hours per week and is currently enrolled in five courses at a college. Mother still cannot afford appropriate housing for her children due to lack of budgeting from mother. All efforts attempted for mother to obtain stability have failed.

Mother further indicated that she was involved with a man that included domestic violence issues to which she ended up in a battered woman's shelter. Mother testified that she had domestic violence issues with [Father].

Mother was sporadic with her visits with her children and with the service providers. Mother was given visitations twice weekly for the past three years. Mother, as recently as of July of 2016 would just visit her children once per month. Mother continues to indicate that she does not understand the needs of the children. Mother was offered numerous services over the past three years and to this date mother is not in a position to parent her children. Mother, after three years of services has not completed the case plan for reunification. Mother has not progressed to unsupervised visitations with her children.

\* \* \* \* \*

Father of [A.A.] is in no position to parent his child. Father . . . does not have consistent and stable housing and employment. [Father] does not have transportation and relies on public transportation or others for his travel needs. [Father] does not have independent housing and currently lives with family members. [Father] testified that he is unaware of [A.A.'s] special needs. [Father] testified that he continues with his parenting classes after three years. [Father] is currently receiving hands-on parenting class in an effort to teach [him] how to parent. [Father] has not demonstrated the ability to assume parenting responsibilities of [A.A.]. [Father] has had difficulties remaining consistent with the supervised visitation with his child. [Father] has received services for three years and is no closer to reunification with his child.

The children are special needs children and require constant care and supervision and have numerous appointments with various providers. The children's needs are all being met in their current placement. The children are thriving in their placement and has [sic] made a lot of progress while in the care of the foster parent. None of the parents have the ability to meet the special needs of the children. . . . Foster parent indicated that removing the children from her home would be detrimental to the children's well-being and the Court believes that to be true.

All parents indicate that they need additional time in an effort to obtain stability in their lives and attempt to be reunified with the children. The Court notes no parent moved to continue the fact finding hearing and no parent has been able to obtain stability over the past three years. The Court must consider the children's well-being. It is unlikely that any parent will be in a position to properly parent these children in the near future. The children have been in the same placement for the last three years and it is the only home that they know. To remove the children would be detrimental to the children's well-being. The children's needs outweigh the parents['] rights to parent these children.

> All parents have demonstrated over the course of the last three years that they are either unwilling or incapable of providing the children with a stable home. Despite being provided with numerous services aimed at reunifying the parents with their children, none of the parents were ever able to progress with services enough to warrant a recommendation of reunification or even unsupervised visitations.
>
> Neither parent is providing any emotional or financial support for the children. No parent has completed any case plan for reunification. No parent is in a position to properly parent these children. No parent is likely to be able to appropriately and effectively parent these children. The children have been in their placement for almost three years and are bonded and thriving in their placement. The children have been in the same placement since the initial removal in November of 2013 and have never been returned to parental care or custody.

Mother's Appellant's Appendix at 32-34; Father's Appellant's Appendix at 2-4. The court further found there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children for the reasons stated above, that termination of parental rights of Parents is in the best interest of the Children, and that DCS has a satisfactory plan for the care and treatment of the Children which is adoption by the foster parent.

## Discussion

[20] The issue is whether the evidence is sufficient to support the termination of the parental rights of Parents. In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

[21] The State's burden of proof for establishing the allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. This is "a 'heightened burden of proof' reflecting termination's 'serious social consequences.'" *In re E.M.*, 4 N.E.3d 636, 642 (Ind. 2014) (quoting *In re G.Y.*, 904 N.E.2d at 1260-1261, 1260 n.1). "But weighing the evidence under that heightened standard is the trial court's prerogative—in contrast to our well-settled, highly deferential standard of review." *Id*. We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn

from the evidence. *Id*. We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. *Id*.

[22] Reviewing whether the evidence clearly and convincingly supports the findings, or the findings clearly and convincingly support the judgment, is not a license to reweigh the evidence. *Id*. "[W]e do not independently determine whether that heightened standard is met, as we would under the 'constitutional harmless error standard,' which require *the reviewing court itself* to 'be sufficiently confident to declare the error harmless beyond a reasonable doubt.'" *Id*. (quoting *Harden v. State*, 576 N.E.2d 590, 593 (Ind. 1991) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967))). "Our review must 'give "due regard" to the trial court's opportunity to judge the credibility of the witnesses firsthand,' and 'not set aside [its] findings or judgment unless clearly erroneous.'" *Id*. (quoting *K.T.K. v. Ind. Dep't of Child Servs., Dearborn Cty. Office*, 989 N.E.2d 1225, 1229 (Ind. 2013) (citing Ind. Trial Rule 52(A))). "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *Id*. at 640. We also note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B).

[23] Mother argues that she had stable housing since May of 2016, there was no evidence she cannot properly parent two special needs children other than that she may not have time to see to their medical needs because she works two jobs

and attends school online, and she would make the time to take the Children to their appointments. She states "on one hand DCS argues that Mother has not successfully obtained steady housing or employment, but then on the other hand chastises Mother and suggests that she cannot take care of her children because she works too much, and is attending online school." Appellant's Brief of Mother at 9 n.6. Mother maintains it is clear from the evidence that she is doing everything she can within her limited means to satisfy the requirements that DCS is asking; she has obtained the same housing since May of 2016, has a vehicle, has two jobs, and is attending online school; there is an insinuation that because her residence is above a bar and small that it is inadequate; that "[j]ust because [she] does not have the size of house that DCS wants her to have or believes that she should have does not mean that the housing that she has had since May of 2016 demonstrates that the conditions that lead to the removal have not been remedied"; and that "[h]er level of finances may not be what DCS wishes or wants, but that is a personal standard at best on DCS' behalf." *Id.* at 12.

[24] Father argues he has fully complied with his case plan, would have suitable housing before the end of the year, and is employed full-time at Walmart. He argues he was not residing with Mother and the Children at the time of removal, he was living with his sister to save for permanent housing, and he worked a second job. He also contends he has not been given an opportunity to parent A.A.

[25] DCS maintains that Mother has a history of housing instability, is not capable of attending to the Children's daily needs, has had three years to demonstrate her parenting abilities, missed approximately half of her supervised visits, continued to live with an inappropriate individual, and has a history of poor decision making. DCS further argues that Father knew that A.A. was in Caregiver's care, his promise to obtain suitable housing was unpersuasive, he did not know that A.A. had special needs, and he failed to attend an estimated thirty percent of his visits with A.A.

[26] In determining whether the conditions that resulted in the children's removal will not be remedied, we engage in a two-step analysis. *E.M.*, 4 N.E.3d at 642-643. First, we identify the conditions that led to removal, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions, balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *Id.*

[27] "The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside the home." *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (citation and internal quotation marks omitted). A court may consider evidence of a parent's prior criminal history, history of neglect, failure to provide support, lack of adequate housing and employment, and the services offered by DCS and the parent's response to those services, and, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances the problematic situation will not improve. *Id.*

[28] To the extent Parents do not challenge the court's findings of fact, these unchallenged facts stand as proven. *See In re B.R.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007) (failure to challenge findings by the trial court resulted in waiver of the argument that the findings were clearly erroneous), *trans. denied*.

[29] The record reveals that the Children have been removed from the care of the Parents since November 23, 2013, Mother agreed that she had been receiving services for three years, lives in a kitchenette above a bar which is not appropriate for the Children and needs a larger apartment, and has moved from job to job, and she testified that as of the hearing date she did not feel she was in a position to care for the Children and provide food and clothing on a day-to-day basis. FCM Middleton testified Mother would participate in about half of her monthly visits and that Father missed about thirty percent of his visits. Mother indicated sometimes she missed her supervised visitation because she

overslept. The record shows Mother was in an altercation with Father, she was referred to domestic violence therapy but was not consistent with the therapy, she indicated in February 2015 she was living with her father when that was untrue and there was a subsequent physical altercation with the person because he made unwanted sexual advances, and she also stated in April 2016 that a person was a family friend or uncle when the person was her companion and later that she "may be getting put out" because the person felt that she was using him for his money. *Id.* at 144. Father testified he was not in a position for A.A. to live with him. He indicated he had recently moved to his sister's house and was on the waiting list for Section 8 housing, that he did not know A.A. had special needs, and agreed that it would be detrimental to A.A. to leave Kimp's home. FCM Middleton indicated she had reason to doubt that Father could obtain housing by the end of November due to the pattern of his previous statements. The trial court found that Mother cannot properly parent two special needs children, has a history of poor decision making, was offered numerous services over the past three years, and is not in a position to parent the Children. It also found Father is in no position to parent A.A., does not have independent housing, and was unaware of A.A.'s special needs. The court found that the Parents have demonstrated over the course of the last three years that they are either unwilling or incapable of providing the Children with a stable home.

[30] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there is a

reasonable probability that the conditions leading to the Children's removal will not be remedied or that the continuation of the parent-child relationship poses a threat to the well-being of D.S. and A.A.

[31] In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the children. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests, and the Court has stated that children cannot wait indefinitely for their parents to work toward preservation or reunification and courts need not wait until the child is irreversibly harmed such that the child's physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re E.M.*, 4 N.E.3d at 647-648. However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.S.,* 17 N.E.3d 994, 1005 (Ind. Ct. App. 2014), *trans. denied.* Further, adoption is a satisfactory plan for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009). "This plan need not be

detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*.

[32] Kimp testified regarding the progress the Children have made in her care and the services they have received, that D.S. was about two years old and A.A. was about four years old when they were placed with her, the Children will continue to need the type of intensive special care she is providing, she believes the best thing for the Children is to remain in her care, and that the Children have bonded with her. Father agreed that it would be detrimental to A.A. to leave Kimp's home. FCM Middleton recommended that the court terminate the parental rights of Parents and that termination is in the best interests of the Children. The court found that termination of the parental rights of Parents is in the best interests of the Children and that DCS has a satisfactory plan for the care and treatment of the Children which is adoption by the foster parent. Based on the testimony, as well as the totality of the evidence in the record and set forth in the court's termination order, we conclude that the court's determination that termination is in the best interests of D.S. and A.A. is supported by clear and convincing evidence. Also, the record reveals support for the court's determination that adoption is a satisfactory plan for the care and treatment of D.S. and A.A. *See A.J. v. Marion Cty. Office of Family & Children*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008) (concluding that, in light of the evidence, the plan for adoption was not unsatisfactory), *trans. denied*.

*Conclusion*

[33]  We conclude that the trial court's judgment terminating the parental rights of Mother as to D.S. and A.A. and Father as to A.A. is supported by clear and convincing evidence.  We find no error and affirm.

[34]  Affirmed.

May, J., and Pyle, J., concur.